Gaston, Judge.
 

 The plaintiffs are, John G. Wade, Edmund Wade, Tinsley Wade, Thomas Wyatt & Jane his wile, Polly Wade. Reuben Long and Sarah his wife, Robert Wade, and James Wade; and the defendants are the executors of James Williamson and of Samuel Painter, deceased, which said Samuel and James had been the executors of John Gwinn, deceased. The bill was filed March 14th, 1836, and charges, in substance, that John Gwinn had purchased, at an execution sale against Robert Wade, a parcel
 
 *314
 
 of negroes, and the said Robert being connected with the said John by marriage, their wives being sisters, having a laroe fam% °f children for whom the said John had a great regard and being wholly insolvent, the said John permitted ne8'wes
 
 io
 
 remain with him, taking acknowledgements ’fromhim, that he held by hire from and as the tenant of Gwinn; that afterwards in the year 1816, Gwinn died, having duly executed a last will whereof he appointed 'Williamson and Painter executors, and wherein he makes the following disposition in regard to these slaves: “ I will and bequeath the following negroes (naming them) to John G. Wade, Edmund Wade, Tinsley Wade, Jane Wade, Polly Wade, Sally Wade, Robert Wade, and James Wade, children of Robert Wade and Anne his wife; to be equally divided among them when James arrives to the age of twenty-one years; the above named negroes, my property, though in the possession of Robert and Anne Wade, and such is the disposition I choose to make of them, and I request my friend, James Williamson to act as trustee to the above named negroes, for the use of Robert and Anne Wade’s above named children;” and it alleges that the plaintiffs John, Edmund, Tinsley, Jane, Polly, Sarah, Robert, and James, are the legatees so named and described in the will aforesaid. The bill charges, that after the death of Gwinn, his said executors permitted the
 
 negroes to remain with Wade
 
 as their testator had done, until a short time before Wade’s death in the year 1819; that then Wade being wholly insolvent, and Williamson, one of the executors, being a creditor of his and desirous of satisfying this demand out of the negroes so bequeathed to the plaintiffs, suggested to one Duncan Rose, who was also a creditor of the said Robert to a small amount, that Wade had acquired the title of said slaves by his long possession; that thereupon the said Rose obtained a judgement against Wade for about f 50, sued out execution, and had it levied on one of the slaves named Harwell; that at , he sale Rose bought Burvvell, and Williamson thereupon, in the name of himself and his co-executors, instituted an action of detinue against Rose, under the pretence of asserting the beneficial rights of Wade’s children to the negro Burwell;
 
 *315
 
 that this was a fraudulent contrivance on his part to destroy their title; that he hastened on the trial of the suit, and, by withholding the proper evidence, contrived to have a verdiet and judgment rendered for the defendant; that immediately thereupon he procured one Jones to take out administration on the estate of Wade, sued Jones as such administrator for a stale demand against his intestate, levied an execution on the. remaining negroes except two, and purchased them in, at the sheriff’s sale, far below their value, having stifled competition by declaring that he was purchasing them in for the plaintiffs. The bill states 'that, in 1835, Williamson died, and these negroes, so bought by him, after his death, came to the hands of the defendants, his executors, together with a large amount of assets; that Painter, the co-executor of Williamson, had also died, leaving a valuable personal estate, which came to the hands of the other defendant, the said Painter’s executor; and states that the plaintiffs have delayed hitherto calling for any account of these matters, because they were advised it was not competent for them to do so until James Wade had attained twenty-one years. The prayer of the bill is, that another trustee be appointed for the plaintiffs, for an account of the hires and profits of the slaves and for general relief.
 

 The executor of Painter disclaims all personal knowledge of the transactions, alleges that his testator lived in Yirginia and took no part in the management of Gwinn’s estate, and insists that the executors of Williamson are solely responsible to the plaintiffs.
 

 The executors of Williamson answer that they have no personal knowledge of any of the tranactions, which occurred before the death of their testator, but allege that the slaves in question were not the property of Gwinn, or if in truth he had any formal or colourable title thereto, the same was held in trust for Wade, and for the purpose of defrauding and hindering Wade’s creditors from obtaining satisfaction of their debts. They deny the fraud charged to their testator in relation to the proceedings of Rose, or the suit prosecuted against him, but aver that Rose, without any intimation from or concurrence of their testator, had his exe
 
 *316
 
 cution levied upon one of the negroes, because the same were Wade’s negroes, and liable to the satisfaction of his creditors; that at the day of sale their testator attended and Publicly f°rbabe the sale) claiming the negroes as the pro'perty oí Gwinn bequeated to the plaintiffs; that Rose having indemnified the officer, the sale proceeded and Rose bought; that thereupon, without delay, their testator sued out a writ of Detinue, in the name of himself and his co-executors, returnable to the February Term, 1820, of Person County Court; that he prosecuted this suit earnestly and in good faith; that it came on for trial at the December Term, 1821, of said court, when the jury found a verdict for the defendant on the plea of non-detinet, and the court gave judgment accordingly — and that this verdict was rendered upon full proof that the negroes which Gwinn bequeathed to Wade’s children of which Burwell was one, were, in truth, the negroes of Wade, and liable for his debts. The defendants further say, that, convinced by this investigation that the negroes belonged to Wade’s estate, their testator gave up all claim to them — that thereupon Robert Jones was appointed administrator of Wade’s estate, and, for the purpose of paying off the debts of the intestate under an order of court, sold three of the negroes, viz. a negro woman, Rachael, and her two children, Hannah and Esther, on the 20th of April, 1822, and that their testator became a purchaser of them, as highest bidder at public sale at the price of $631 50 cts., which they aver to be not only a fair but a very high price, and they deny the charge, that he, in any manner, stifled competition or gave out that he was purchasing tor the plaintiffs. They admit that they have been informed that he had a demand against Wade, which was prosecuted to judgment, but deny that the sale took place under execution. They further say, that on the 17th August, 1822, the administrator, under a like order of court, sold another of the negroes, named Russel, who was purchased by John G. A. Williamson, who afterwards sold him to their testator, and that these are the only negroes of those named in the will of Gwinn, whieh ever were in the hands of their Testator, since his abandonment of claim as executor, and the administration
 
 *317
 
 of them as the property of Wade, and these the testator hath held and claimed notoriously, and, until now, undisputedly, as his absolute property. The defendants further say, that in 1823, for the purpose of closing his administration, and for the purpose of making distribution between the widow and children of Wade, the administrator, under an order of court, made sale of the other two negroes, Will (or Buck) and Ben; that these were bought by Thomas Woody, “one of the plaintiffs” at the price of $1,112 50 cents; and that shortly thereafter all the plaintiffs settled with the said administrator, and received their parts of these proceeds in their character of next of kin of Wade. It may not be amiss to remark here that it is a mistake in this answer, and a similar one is to be found in the commissioner’s report, to represent Woody as one of the plaintiffs. He intermarried with Elizabeth Harriet Wade, who was not a legatee in Gwinn’s will, and not with Jane Wade. The latter intermarried with Thomas Wyatt. The defendants, in their answer, deny that the plaintiffs delayed bringing suit during the life of their testator, because of the pretended advice that it was not competent for them to demand their negroes or an account, until the plaintiff James should arrive at 21 years, and they say that the bequest of the negroes was direct to them, and vested an immediate interest in them, although a postponement of the division was directed, until the arrival of James at age; they allege that John G. Wade was of age in 1815, Edmund, another of the plaintiffs, in 1819 or 1820, and there was nothing to prevent the plaintiffs, if they conceived themselves aggrieved by any of the acts whereof they now complain, from bringing forward such complaint while the matter thereof was fresh, and the truth could be ascertained. They insist that their testator, in all his conduct which the plaintiffs arraign, acted with perfect integrity and good faith, claim .for him and his estate the benefit of the act of limitations, barring actions of detinue and trover, if not prosecuted within 3 years after cause of action accrued, of the act of the General Assembly giving a title to slaves to the possessor against whom such action has not been prosecuted within the limited time aforesaid, and
 
 *318
 
 contend that he is not precluded from the benefit of these acts, because of his being made a trustee in the said will for the plaintiffs, for that by a proper construction thereof, the same were not bequeathed to him in trust for them, but he was merely requested to render any services to them in his power as their friend.
 

 A general replication was taken to the answer and proofs have been offered on both sides. The court, also, upon the hearing, being desirous of procuring some more detailed information than the proofs exhibited,
 
 directed, oí its own
 
 motion,^ special inquiry. This has been made and considered with the proofs in the cause.
 

 The transactions, brought under judgment in this case, occurred many years ago, and, in respect to a part of them, it is impossible to obtain, now, precise and certain information. There are some, however, with respect to which, we can pronounce with much confidence. There, is no proof that the late Mr. Williamson procured Jones to administer on the estate of Robert Wade: The charge that he endeavored to stifle competition at the sale of the negroes at which, he purchased — that the sale was made upon executions at his instance — that he bought professedly for the plaintiffs, and at an under value — is, in all its parts, unfounded. The proofs are full, that the sale was made by the administrator under an order of court; that it was conducted, in all respects, fairly, and that Williamson purchased for himself, and at high, certainly full, prices. The charge also that he suggested to Duncan Rose that Wade had acquired title to the slaves in question by adverse possession, that he instituted the suit in bad faith and as a cover to conceal his purpose of applying the property of the plaintiffs to the satisfaction of his stale demands against Wade, and that he withheld evidence in order to prevent a decision of that suit against Rose, is unsupported by proof. The suit appears to have been honestly brought and honestly conducted under the direction of respectable counsel, and Rose positively repels any collusion or understanding, whatever, between him and his adversary, either in relation to his selling the negro Burwell, as the property of Wade, or the suit brought in consequence
 
 *319
 
 thereof. Dismissing therefore these charges, we are brought to other matters, in respect to which there is less certainty,' that is to say, first, upon what ground was the suit of the executors of Gwinn against Rose, determined? and, 2dly, was it decided in conformity to law and right? Upon the proofs, we collect, that in December, 1801, James Williamson obtained a judgment in Person County Court against Robert Wade by confession, for the sum of £588. 7. 0. and costs; that a fi. fa. issued thereon and was levied on certain negroes and other personal property of Wade; that upon this fi. fa. the sheriff returned that he had sold to James Williamson a negro boy, Frank, and some other articles, and had sold to John Gwinn negro woman Mary for £5. 1. 6., negro boy, Anthony, for £58. 0. 6., and negro woman Rhoda and child for £185. 0. 6., and thereon was endorsed a receipt from Williamson for £487. 1. 9. in part of his judgment, that being the amount of the sales after deduction of £13. 18. 4. for the costs of the suit; and the sheriff executed a paper writing, unattested however, and without seal, bearing date the 18th of January, 1802, in the nature of a bill of sale to Gwinn for the negroes so purchased. This instrument was resgistered upon the acknowledgment of the sheriff at Term, 1808. The only direct testimony as to the occurrences at the sale, comes from Mrs. Wade, the widow of Robert Wade and mother of the plaintiffs, who states that when her husband was sold out, Mr. Gwinn bid off Rhoda and her child Jane, and on the evening of the day, told her husband, if he wished to keep them, to do so until he called for them; that she saw no money paid, but that after the sale, the deputy sheriff, her husband, Mr. Gwinn and Mr. Williamson retired to themselves to have a settlement. We have no information from any quarter about the negro woman Mary and the negro boy Anthony, which Gwinn bought at the same time; but we must presume that these were carried off by him. From the testimony of this witness, it appears that Mr. Gwinn gave the young slave Jane to her daughter and eldest child, Elizabeth Harriett Wade, and sold Joe, one of Rhoda’s children afterwards born, to Mr. Williamson. During the life of Gwinn, Rhoda and
 
 *320
 
 the rest of her children remained with Wade, were called him Gwinn’s negroes, and from year to year, notes, for small sums for their hire, were given by Wade to Gwinn. After Gwinn’s death, such of them as were fit to be hired .out, were hired out by Wade, under the directions of Williamson, and the rest of them remained with him and the family until Wade’s death, which happened about the end of the year 1819. Shortly before his death, Duncan Rose, who, as one of the firm of Rose & Chambers, had a demand against him of about 80 or 85 dollars, having received information from Wade himself that the negroes were his in truth, but covered for him by the pretended purchase of Gwinn, prosecuted this demand to judgment and levied the execution on Burwell, one of the negroes; when the officer came to levy, Wade produced the bill of sale from the sheriff to Gwinn; whereupon the officer, before he would sell, required from Rose a bond of indemnity. This was given; the sale took place in January, 1820, and Rose bought, and Williamson instantly sued him.
 

 After Wade’s death and until the decision of this suit, Williamson hired out two of the negroes, Buck and Ben, as appears from an account current exhibited by the plaintiffs, in which he charges himself, in account with the children, with the amount of the hire of Buck and Ben, for the years 1820 and 1821, and takes credit for necessaries furnished them and for the expenses and costs of,
 
 their suit.
 
 The plaintiffs exhibit, also, a letter from Williamson to Mrs. Wade, dated February 12th, 1821, while this suit was pending, in which there are direct references to it. He commences by complaining that after he had hired Ben he understands that she had hired him to another person, and states that if that is the way in which things are to be done, “ he must give up all the papers of Mr. Gwinn and the law-suit go as the
 
 direct of the Court”
 
 — then, after stating that the man to whom he has hired Ben will yet take him if she can get him back, and if not, that he must try “ what.the law will say to that,” he remarks that “ he has
 
 offered up
 
 all the business to Mr. Woody,” (the husband of her daughter Elizabeth) “but
 
 he
 
 will not take it, and that Mr. Painter is out of the
 
 *321
 
 State, so as to get his advice,” and proceeds to make some quiries about the boy that Rose claims, and then puts an enquiry in these words: “ and should the children gain the ne
 
 gw,
 
 and Mr. Rose appeals to equity, who will answer the bill, I am at a loss to know.” There is no evidence on either side, of the occurrences at the trial. Rose states that he had previously given all the necessary instructions to his attorney, and had been told by his attorney, if his presence should be required he should be called. He either resided at the village where the Court was held, or had a shop there, which required his attendance during Court. He was called and went to the court house, and on arriving there learned that the cause had been tried. He is under the impression, from what he has heard, that he gained the suit upon the statute of limitations. It appears from the record, that the defendant pleaded non detinet, the statute of limitations and release, and that the jury rendered a verdict for the defendant
 
 “
 
 on all the issues.” There was no motion for a new trial or an appeal, and at the same term administration was granted on the estate of Wade to Robert Jones, on his entering into bond with James Woody and Moses Chambers as sureties. Jones, the administrator, forthwith took into his possesion all the negroes, except Burwell, that had been claimed and held for Wade’s children, and made return thereofin his inventory to the succeeding March Term of the Court. At that term there was an order oí Court for the sale of Rhoda and her children, Hannah and Esther, and these were bought at public auction by Williamson, who alleged as a reason for giving such high prices, that he owned Joe, one of Rhoda’s children, and had a favorable opinion of the family. At June Term following, there was an order of sale for another of these negroes, Russel, and he was bought byason of Mr. Williamson’s; and at November Term, 1823, there was an order to sell the remaining two negroes, Will (or Buck) and Ben, and these were sold, and bought by James Woody. The administrator made return to court of all these sales, and exhibited his account of debts paid, and disbursements, and, in November, 1825, the balance found due upon that account, was distributed over .and paid unto the wido-vy
 
 *322
 
 0f'Wade and the plaintiffs; of whom John, Edmund and Tinsly were then ot age. Jane acted by her husband, Thomas Wyatt, and the remaining plaintiffs, Mary, Sarah, James ant^ ®,0^er(: were represented, and acted by the said Thomas Woody, their guardian. At the time of the sale by the administrator of Wade to Williamson, John, the eldest of Wade’s children, except Elizabeth, who was not a legatee in Gwinn’s will, was about the age of twenty-one — and when this bill was brought, James, the youngest, had not quite attained that age. By the will of Mr. Gwinn, all his estate, real and personal, was given to his wife with the exception of Rhoda and her children.
 

 From these facts, the inference is not to be resisted that the action against Rose was decided upon the ground that the negroes which had been bought by Gwinn, left with Wade and bequeathed to Wade’s children, were, with respect to Wade’s creditors, the property of Wade, and therefore liable to be taken in execution for his
 
 debts.
 
 It was upon this ground, Rose had undertaken to seize one of them, and had indemnified the sheriff for selling. It was to try this question that the action was brought. The length of time, during which Wade had been permitted to enjoy the labor and profits of the negroes, was no doubt insisted upon ás a material circumstance to shew the alleged fraudulent trust for him, but it could not be set up
 
 per se
 
 as a bar to Gwinn’s action, or that of his representatives. Now if it could be shewn that this decision was against right, an interesting question might arise, whether Williamson, acting honestly under the belief that it was right, and thereupon surrendering all the negroes to the administrator of Wadea would not be protected in so acting. If a trustee under a misapprehension of right founded upon his own judgment, or even, it would seem, upon the judgment of counsel (except perhaps in some very peculiar cases) parts with the possession of property to persons not entitled — it is his misfortune, but public policy requires that he should be the sufferer. See
 
 Doyle
 
 vs.
 
 Blake,
 
 2 Sch. & Lef.
 
 243—Voz
 
 vs-Emery, 5 Ves. 141. In such a case he is regarded as having acted incautiously although innocently. But it is well
 
 *323
 
 worthy of consideration, whether an imputation of want of caution can rest upon him for acquiescing in the correctness of a judicial sentence; pronounced, by a competent tribunal of his country — it being well understood that he is not cognizant of error or surprise therein, or any unfairness in procuring it. Williamson is clearly protected by that judgment against the demands of the plaintiffs to account to them for Burwell — the immediate subject of the action in which the judgment was rendered — and it would require some strong reasons to shew, that after a judicial decision, involving the right of all the negroes, he was bound in caution to stand the suits of the creditors, who, upon that decision, would undoubtedly come upon him as executor
 
 de son tort
 
 of Wade for the other negroes. But we do not determine that question, for we feel ourselves bound to hold that the judgment in that suit was right. In the first place, this is the presumption of law. Every decision of a competent court must be deemed to be according to the law and the truth of the case, until the contrary is shewn. The plaintiffs were represented in that cause by the executors of Gwinn, their trustees — and it must be held by us until the contrary is shewn, that it was then rightly decided that the plaintiffs were not entitled to the negroes bequeathed by Mr. Gwinn, against the creditors of their father. The contrary of this presumption is not shewn. If the facts which we have ascertained, do not prove that Gwinn’s title was nominal, and set up for the benefit of Wade, they do not disprove it. If he honestly purchased Rhoda and her child for himself, and not under a trust for Wade, and paid his money therefor, he had a right to allow Wade, as long as he pleased, the benefit of their labor. But as it is every-day’s experience that when embarrassed men are “sold out,” contrivances are resorted to “to cover their property” under formal alienations to their friends, and as the truth, in regard to such fraudulent alienations, can seldom be eviscerated but by a minute and scrupulous consideration of all the circumstances attending the transaction, too much stress ought not to be laid upon the mere forms that Gwinn was the highest bidder, and received the evidence of title. It may - have been, notwith
 
 *324
 
 standing, that he either bought with Wade’s money, or was un<^er
 
 engagement
 
 to hold for Wade after indemnifying himself for what he had paid, and had só indemnified himself. The circumstances that Mary, Anthony, and Joe had been appropriated to his use — that he gave one of Rhoda’s children to Wade’s eldest child — that he permitted Wade to have the uninterrupted, use of Rhoda and her other children for fourteeen years — that in his will he bequeaths them — and nothing else — to the other
 
 children of Wade,
 
 with directions that they shall be kept together
 
 for twenty years more,
 
 that is to say, until James Wade, then but a year old, shall attain full age — the request that
 
 one
 
 of the executors, James Williamson, who was privy to the circumstances under which he bought, and the manner in which the business was arranged upon that purchase, should act as trustee of the negroes which he chooses thus to dispose o£~-the conduct of Williamson, in permitting Wade to hire out such of them as were fit to be hired, and, as far as we can discern, to receive the hires — the production
 
 by Wade of
 
 the sheriff’s bill of sale when a creditor attempts
 
 ta levy.
 
 — all
 
 these have
 
 a tendency at least to prove that Wade, by the understanding of the parties, was the beneficial owner,
 

 We think the letter, exhibited by the plaintiffs, greatly strengthens this inference. If there was a man then living, who knew fully the true character of this transaction, it was Williamson. It was on a judgment,
 
 rendered at his
 
 instance and by confession, that Wade was sold out, and the sale took place as soon after the rendition of the judgement as it well could; the,court was in December and the sale in January. Every thing that was then sold, was bought either by himself or- Gwinn. He was present at the settlement with the sheriff on account of the purchases, and endorsed on the
 
 fi. fa.
 
 His receipt of the-money in part of his judgment, and is not only one of the persons selected by Gwinn as deserving of his general confidence and therefore fit to be his executor, but, for some reason or other, as peculiarly fit to act as trustee ofthis property for the use of those to whom Gwinn bequeaths it. In this letter, which, throughout, manifests, not only displeasure with the widow’s conduct, but great perplexity be
 
 *325
 
 cause of the “lawsuit,” and a desire to get rid of his entanglements, and devolve them on the other who was connected with her and the children — he states one matter on which he is anxious to
 
 get
 
 information; “if the children gain the negro, and Rose appeals to equity, who will answer the bill, I amat a loss to know.” Now this cannot mean that he wants
 
 legal
 
 information from her on the subject. It would be a strange quarter to apply to for information of that character. And it seems to us exceedingly difficult to give it any meaning but one, and that is, “if Rose files the bill to investigate the alleged fraud or trust, upon the supposition of which he sold the negro, and an answer must be put in
 
 upon
 
 oath, what is to be done then?
 
 Who
 
 is to answer that bill? I know not.” But these are not the only considerations which tend to strengthen the presumption that the decision, in the suit, was according to. the truth. The suit was tried in open court, and involved a matter calculated to excite public attention. The eldest son of Wade was not then indeed, of age, but was actually a clerk in the employment of Rose and Chambers. Woodly who had married the eldest daughter, and whom Williamson had been anxious to substitute as the person to carry on the suit, was at the court, for he joined with Chambers as a surety in the administration bond of Jones. Now it seems morally impossible, if the judgment had been against right, that an impression to that effect should not have been made, and some proof now offered to shew it. Woodly and Chambers have both been examined in this suit — but they testify nothing on this point. Instead of any complaints against the judgment, there seems to have been an immediate and universal acquiesence in its justice. The executors renounce all claim upon the property, as that of their testator or his legatees. An administrator of Wade is appointed by the court — and one certainly approved of by Woodly. The creditors of Wade forbore from harrassing the estate. It was disposed of upon the most advantageous terms upon credit. All the creditors were satisfied — the balance due to the family of Wade ascertained — those of ability to act received
 
 *326
 
 their portion of it, and those not of age had a guardian appointed, who must have known the whole transaction. He received their parts, and they afterwards received them from And after this complete settlement, no attempt was 'made to break in upon it, and no complaint uttered against it, until 1836, after both of the trustees of the plaintiffs were dead. The excuse assigned, for this apparent acquiescence on the part of the plaintiffs, is unfounded both in law and fact. There can be no question but that the bequest passed a present interest to the legatees, and the bill
 
 was
 
 filed before the youngest child had attained full age. It will be noted that this acquiescence is not regarded by us, as a waiver of an ascertained right, or ratification of an act confessedly wrong, but simply as matter of evidence, upon the enquiry whether there has been a violation of right.
 

 Having arrived at the conclusion, that the decision of the court against Rose rightly adjudged thaqthe negroes, claimed by the plaintiffs under the will of John Gwinn, belonged to their father’s estate, so far, at least, as his creditors rvere concerned, we have no difficulty in dismissing their bill. The property has been applied so far as was necessary for the satisfaction of these debts — and none can doubt but that the mode pursued, and of which they complain, has been most beneficial to them — by causing these debts to be discharged without a sacrifice, and thus securing to them a surplus which could not otherwise have been realized. If the executors of Gwinn had held on to the property and allowed themselves to be sued as executors in their own wrong of Wade, the plaintiffs would probably have lost all.
 

 We are relieved from the necessity of considering the
 
 defences
 
 set up because of the statutes referred to in the answer; and we therefore forbear from intimating an opinion in regard to them.
 

 The bill must be dismissed. We have doubted whether it ought not to be dismissed with costs, because of the unfounded charges of fraud which it prefers. But most, if not all, of the plaintiffs, were infants, when the matters occurred which the bill seeks to investigate, had an apparent cause for
 
 *327
 
 demanding an investigation, and may have been misled into these imputations by false rumors. Upon the whole we dismiss it without costs to either party.
 

 Pee Curiam. Bill dismissed, but without costs.